Medill, Admr., v. Fitzgerald et al.

*H. P. Lloyd*, for plaintiffs in error.
*W. W. Prather*, for defendants in error.

---

## APPEALS—GIFTS—ADVANCEMENTS—EVIDENCE.

[Jefferson Circuit Court, 1898.]

Laubie, Frazier and Burrows, JJ.

WILLIAM MEDILL, ADMR., v. HENRY FITZGERALD ET AL.

SAME v. SAME.

WILLIAM MEDILL, ADMR., v. ROBERT LYON ET AL.

SAME v. SAME.

1. TO ESTABLISH A GIFT BY WAY OF ADVANCEMENT THE EVIDENCE MUST BE CLEAR AND CONVINCING.

Where a decedent, at his death, holds promissory notes and a mortgage executed to him by his daughter and her husband, in order to establish a claim that the money for which such instruments were given was a gift to the daughter by way of advancement or otherwise, the evidence must be clear and convincing.

2. INSUFFICIENCY OF EVIDENCE TO ESTABLISH AN ADVANCEMENT, OR A GIFT INTER VIVOS OR CAUSA MORTIS.

Evidence that such money was advanced by the father to build a home for the daughter, with the intent that interest thereon should be paid to him during his life and that the principal should be the daughters, at his death, is not sufficient to establish an advancement, or a gift *inter vivos* or *causa mortis*.

LAUBIE, J.

The cases of William Medill, as administrator of Christian Schneider, deceased, v. Henry Fitzgerald and wife, and the same plain-

8 O. C. D. 9

tiff **v.** Robert Lyon and wife, are of the same character, wherein the parties appeal, and prosecute error from the same judgment.

The defendants move to dismiss the appeals, and the questions presented are whether a party may appeal and prosecute error at the same time, from the same judgment; and if so, secondly, whether there was any right of appeal in the cases.

So far as the first question is concerned, it has been recently decided by the supreme court, that a party may appeal and proscute error at the same time, and if it be determined that there was no right of appeal, then the error proceedings would stand.

Upon the question, whether the cases were in fact appealable under the statutes, we also hold against the motion. Either party had the right to appeal.

The actions upon the part of Medill were brought, as stated in his petition upon three several causes of action; the first two upon independent promissory notes, executed by the defendants to the decedent, and the third for the purpose of foreclosing a mortgage given to secure the larger of the two notes in each case.

There was no denial in the answers of the execution and delivery of these notes and mortgages, but the defendants set up, in each case, in the nature of a cross-petition, an equitable cause of action to have the notes and mortgage delivered up and cancelled, on the ground that the money which they represented was a gift by way of advancement to Mrs. Fitzgerald and Mrs. Lyon, the daughters of the decedent.

In such a case, where by cross-petition the party seeks equitable affirmative relief which, if granted, would extinguish the legal cause of action, either party has the right of appeal. Gill v. Pelkey, 54 O. S., 348.

Appeals were properly taken in these cases and the petitions in error may be dismissed.

The question now recurs upon the disposition of these appeal cases. An agreement is presented to us by counsel, that in case this court find the appeals properly taken and good in law, that we should consider the cases as tried before us upon the testimony contained in the bill of exceptions, the same as if the witnesses had testified before us orally.

As I have said, the only issue in either case, was upon an equitable cause of action in the nature of a cross-petition, and those equitable causes of action were simply and only that the money represented by the notes and mortgages, had been given to the daughters, Mrs. Fitzgerald and Mrs. Lyon, by Christian Schneider, the decedent, as an advancement, either in full or in part satisfaction of their share of his estate upon his decease.

The burden of proof, therefore, rested upon the defendants to show that the money specified in these papers had been given to these women as a gift by their father; by way of advancement and I may say here that in a case like this, where notes were taken for the money, signed by both husband and wife, and the payment of those notes secured by mortgage on the property which it was claimed the money was given to build, a mere preponderance of the evidence is not sufficient to establish the affirmative of that issue upon the part of the defendants. In all such cases the evidence must be clear and satisfactory that such was the agreement between father and daughter, and a mere preponderance, which is the rule in all ordinary civil cases, is not sufficient.

In the case against the Fitzgeralds, the two notes, one for $300 and one for $800, were payable one year after their date, and were dated in September, 1891.    The claim is that in the spring prior thereto, the father gave them the money represented by these notes, to build a house for themselves upon the lot in question.    It is alleged in the cross-petition that the decedent gave this lot to them at that time, but there is no evidence of it.    Fitzgeralds, or one of them, owned the lot; which one does not appear, nor does it appear from whom the title was derived, nor is it material to the disposition of the case.

The same thing is true as to the Lyons case, but in that instance the house was built and the money advanced in 1894 and the notes executed December 24, 1894, more than three years after the Fitzgeralds', but when the house was finished is not distinctly shown in the evidence. In one case, the contractor who had built the Fitzgerald house, testified that Fitzgerald paid him the money, and not Schneider, and in the other case the contractor who built the Lyons house says that Schneider paid most of the money, and Lyon paid him some; but when the money was paid or given, or the houses finished, is not definitely shown.    The daughter of Fitzgerald, testifies that in the spring of 1891, as she came home from school, her father, mother, and grandfather were upon the porch of the house they lived in, and she heard her grandfather say he would give her mother and father money to build a house, and her Aunt Menie, too—that was Mrs. Lyons—and her grandfather said, "You had better take it now as any other time," and she says, "They said all right, and they took the money and built the house."    But that any money passed at that time, or that she saw the money, does not appear. It is a general statement or conclusion of hers, that they took the money and built the house.

There is no evidence really as to when the money was given, except that it must have been paid by Mr. Schneider, or handed over to the parties, while the houses were building.    At all events, in each instance, after the house was finished these notes were executed for the amount that Mr. Schneider had advanced, and a mortgage taken by him to secure the larger note.    In each instance there were two notes given, of the same date, payable one year thereafter, one for $300 and one for $800 by the Fitzgeralds; and one for $300 and one for $500 by the Lyons, but for some unexplained reason the decedent did not include both notes in the mortgage.

Now, an advancement is a gift to take effect immediately, as the share, or part of the share, of a child in the estate of the father, which the child would otherwise receive at his death, intestate.    It is a gift absolute, to take effect immediately.    And, therefore, it was incumbent upon these defendants to show that the money represented by these papers was a gift absolute, and to take effect at once.

Here the old gentleman took notes from each for the amount advanced, signed not only by the daughters, but by their husbands, each payable a year after its date, with a mortgage on each house from each couple to secure the larger part of the indebtedness represented on the face of the papers.

On the face of things, therefore, it was not a gift, but a loan.

In what manner and to what extent did these defendants rebut this, and show that the papers did not represent the true contract—that instead of it being a loan, a debt from them payable to the old gentleman in one year, it was an absolute gift to take effect *in presenti*.

The evidence, offered by the defendants themselves, taking it all just as it stands in the bills of exceptions, instead of showing an absolute gift, to take effect *in presenti*, shows a gift to take effect at death, if at all.

The brother of the decedent testified that the decedent told him he had given this money to his daughters to build houses, and had taken notes and mortgages for it, (the only witness in the case that ever heard the decedent speak of the notes and mortgages).

Mrs. Schneider, who is a sister-in-law of Christian Schneider, the deceased, testified that he said ; " He gave the girls money to build the houses and they have to pay him interest as long as he lived. He have to live on the interest and when he is dead, it is the girls."

William Y. Durban testified that the decedent "said several times, along in 1894 and 1895, after both houses had been built, that he had helped his daughters to build their houses in order for them to have homes ; that they were to pay him interest while he lived, and at his death it was to be theirs. He didn't say he held any notes or mortgages against them, but he said, if they didn't pay him the interest, he could sell the property ; he wanted the interest to live on while he lived, but if they didn't pay the interest, he could sell the property." And upon cross-examination he says : " Q. He said, when he died he intended to give it to them. Is that it? A. Yes, sir." In his re-direct examination, he says : " Q. Did he say he intended to give it, or that it was theirs when he died? A. He said it would. be theirs when he died." "Re-cross examination. " Q. He didn't say it was theirs then ? A. No, sir, because it wouldn't be theirs as long as he was collecting interest on it."

Mrs. James Craig says : "Q. He said that he had given Yetta and Menie money to buy this property. Q. Did he say how much? A. I couldn't say exactly, but it seems to me that he gave Yetta $1,100, and then he thought he ought to give Menie something and he gave her $800, and they built their houses. Q. Did he say he had notes and mortgages against them ? A. No, sir. He said they had to pay him the interest on this money his life time to keep him, and at the end of his life he expected them to keep their property. That is the conversation he had with me. It is no interest to me. Q. He didn't say whether he had one or two notes ? A. He didn't say he held any notes or mortgages. Q. But he said they had to pay interest during his life? At his death he expected to give them the houses ? A. He didn't expect to give it, he had given it. He expected them to keep it. He wanted interest on the money during his life time. Q. At the end of his life it was theirs? A. At the end of his life he was going to let them have it. Q. He had given it to them—he gave it to them. Explain that to me. A. I am telling you as he told me. He said he gave Yetta, I think, $1,100, I wouldn't be sure, and they were going to build a small house or had a small house, and he proposed her to have a better and a larger house. He gave her $1,100, I think that was it. Then he wanted Henry Fitzgerald to pay him interest on that during his life and he was going to make him do it, and at the end of his life, the property would be theirs. Q. That is what he told you ? A. Yes, sir."

Mr Ellis says : " After Henry Fitzgerald's house was built, him and me got into conversation in the shop. We got to talking about building and about the children. He said be allowed to give the girls this property at his death. He said he would hold a claim on it and if

they would pay him a small interest up to his death, the property would be the girls'. He said he intended to give Charley—he told me the amount, but I don't know what the amount was. Afterwards he said Charley sent again to him for money. He said John and him went in the pottery. He didn't say he paid any for John, but that John and him had taken stock in the pottery. Q. Did you have any talk afterwards about Mr. Lyon? A. Not that I know of. Q. He never talked about Mr. Lyon's house? A. No sir, nothing more than he said he intended to give the girls their share of the property. Q. That was before Mr. Lyon built his house? A. Yes sir. Q. After Mr. Lyon built you had a talk again? A. Yes sir. He said he would claim a little interest. He wouldn't charge much interest until his death and then the property would belong to the girls. I told him at the same time—why don't you make them a deed—I give my children a deed apiece for a house and lot. I says, why don't you keep a little claim on it; I says, I thought I might as well have the good of it as other people. I couldn't get any rent for it and everybody that lived in it cheated me out of the rent and I wanted clear of paying taxes for it. Q. What did he say to that? A. He laughed and said it was time enough when he died for the girls to get the property. He said he intended for them to have homes and help them build their homes and proposed for them to have them."

So the defendants themselves proved the declarations of the old gentleman, that it was a gift, not to take effect immediately, but at his death, which was consistent with the fact that he had taken notes and mortgages for the amounts.

That he failed to carry out his intention cannot now be helped. It is possible, ignorant man as he was—and these parties all seem to be ignorant—he may have believed that because he did not record the mortgage it would not be good, and would be worthless at his death.

It appears from the evidence of Mr. Fitzgerald and Mr. Lyon, that after the death of the decedent they approached Medill, the administrator, about these notes and mortgages, and asked him if they could be collected; that Medill told them yes, that he was going to try to collect them, they must make some payment; that he put the mortgages on record as soon as he discovered them, and he was going to foreclose them if they did not make some arrangements about them.

What was their answer about it at the time, from their own testimony? Why, they said we never expected to pay, or to have to pay those notes; the old gentleman gave the money to our wives, and he said he would not record the mortgage, and the mortgage is no good. They made no claim whatever that this money was given to the wives as their share in whole or in part of the amount they would receive at the death of the father out of his estate. Ignorant people as they are, they would know about such gifts, although they might not know the technical names thereof.

This is consistent with the statement of Mr. Conway, another witness on the part of the defendants, who testified. "Mr. Schneider and I were particular friends. I used to go over there often. I lived right across the street from him. He was telling me who owed him and he told me Mr. Lyon owed him $800 and Mr. Fitzgerald $700. He told me they hadn't been paying the interest. That is what he told me."

The witness was mistaken as to the amounts, but the defendants themselves were showing that the decedent referred to the monies secured by the mortgages.

It is far, therefore, from being made clear that this was a gift by way of advancement ; and it is equally clear that it was not a gift *inter vivos*. The same testimony that shows it was not an advancement shows it was not a gift *inter vivos*. To be such it must be clear that there was a gift and delivery of the money, to take effect at once. Nor would it be a gift *causa mortis* because obligations were taken for the money and were held by the decedent until his death.

We are compelled to come to this conclusion. We have examined this case thoroughly and would be pleased if we could save these poor people their homes, because we are convinced the decedent intended to give them this money, but ignorantly failed to legally carry out that intent. Unfortunately we are unable to do it.

Judgment must be taken for the plaintiff in each case.

*W. L. Medill*, attorney for plaintiff (in both cases).

*Erskine & Erskine* and *Rogers & McCauslen*, attorneys for defendants. ·